## In re Consolidation Coal Company

*Philip C. Wolf* and *Henry Ingram*, of *Rose, Schmidt & Dixon*, for appellants.

*William A. Parker*, for Department of Environmental Resources.

DENWORTH, *Member,* January 30, 1976—This case includes five appeals by appellants, Consolidation Coal Company, Harmar Coal Company and Christopher Coal Company, that have been consolidated because they all challenge the authority under The Clean Streams Law for the Department of Environmental Resources' present policy of issuing one consolidated mine drainage permit for an entire mine operation instead of continuing the prior practice of issuing a mine drainage permit for each discharge at a given mine. This policy, which was never set forth in a regulation, was instituted by the department's predecessor, the Department of Health, in 1970, but because of "manpower limitations" was not immediately applied to consolidate all existing mine drainage permits. Instead, the department's practice has been to implement the policy by issuing one consolidated permit, usually by amending an existing permit, whenever an

applicant applies for a new borehole or shaft at an existing mine. In one of the cases here, the department cancelled two separate drainage permits and issued a consolidation permit for the two when the applicant applied to discontinue a third discharge at the same mine.

The department's motion to dismiss these appeals on the ground that the department's action was not an "appealable action" was denied by order of the board dated February 25, 1975. As the parties have submitted the case to the board on a stipulation of facts, as provided for in the board's Rule 21.32(c), 25 Pa. Code §21.32(c), no evidentiary hearing has been held.

Based on the stipulation and other evidence of record on this matter, we enter the following

## FINDINGS OF FACT

1. Consolidation Coal Company (hereinafter "Consol") owns the Blacksville No. 1 Mine and the Blacksville No. 2 Mine. Christopher Coal Company (hereinafter "Christopher") owns the Humphrey No. 7 Mine. Harmar Coal Company (hereinafter "Harmar") owns the Oakmont Mine. All four of the mines are underground bituminous coal mines, and all are operated by divisions of Consol.

2. Prior to October 12, 1972, each of the discharges at each of the mines or facilities owned or operated by Consol, Christopher or Harmar in the Commonwealth of Pennsylvania had a separate mine drainage permit.

3. The Oakmont Mine has a total of three discharges which are the Barking Portal discharge, the Blackburn Borehole and the Pyle Borehole.

4. The Oakmont Mine is located in Allegheny County and, prior to September 12, 1973, its Bark-

ing Portal discharge located in Plum Borough was authorized by permit no. 468M022 (permit authorizing the operation of a coal mine) issued by the Department of Health of the Commonwealth of Pennsylvania on October 18, 1968.

5. On September 12, 1973, Consol made application to the department for permission to eliminate the discharge from the Barking Portal of the Oakmont Mine.

6. By letter dated December 10, 1973, the department approved Consol's application to eliminate the Barking Portal discharge, subject to the special condition that the other two permits for discharges at the Oakmont Mine—the Blackburn Borehole authorized by permit no. 466M028 and Pyle Borehole authorized by permit no. 468M009, were to be cancelled and consolidated as permit no. 648M002.

7. A portion of the Blacksville No. 2 Mine is located in Greene County and, prior to October of 1972, its Carpenter Shaft discharge was authorized by permit no. 3071303 issued by the department.

8. On or about October 24, 1972, Consol applied to the department for a mine drainage permit for the proposed Staggers Shaft discharge located in Wayne and Gilmore Townships. However, on November 10, 1972, Consol was advised by the department that its application for a permit would be considered only as the request for amendment to its permit no. 3071303 covering the Carpenter Shaft discharge.

9. On December 8, 1972, Consol requested the issuance of a separate permit for its proposed Staggers Shaft discharge at its Blacksville No. 2 Mine and by letter dated December 18, 1972, was advised by the department as follows:

"[I]t is presently the policy of this Department to issue only one permit for each individual mine regardless of the number of discharges or openings . . ."

10. On March 21, 1973, Consol renewed its request for a separate permit. On April 9, 1973, the department issued Consol a letter-permit, including the proposed Staggers Shaft discharge as an amendment to its permit no. 3071303 for the Carpenter Shaft discharge.

11. By letter dated April 12, 1973, counsel for Consol advised the department that by accepting the permit, Consol was not withdrawing its request that a separate permit be issued and that such acceptance did not constitute a waiver of Consol's position that the action of the department in issuing the Staggers Shaft permit as an amendment is contrary to law.

12. On September 11, 1973, counsel for Consol received notification from the department advising Consol that the department would not issue separate permit for the Staggers Shaft discharge at the Blacksville No. 2 Mine.

13. A portion of the Blacksville No. 1 Mine is located in Greene County and prior to September 10, 1971, its Renner Shaft discharge was authorized by mine drainage permit no. 3071301.

14. Construction is currently under way on a new and separate shaft approximately 5,200 feet from the Renner Shaft, said shaft to be known as the Fox Shaft located in Wayne Township.

15. Discharges from the present Renner Shaft flow into an unnamed tributary of Dunkard Creek, but discharges from the completed Fox Shaft will flow into Sharps Run and then into Rudolph Creek before entering Dunkard Creek.

16. On or about November 15, 1971, Consol applied to the department for a mine drainage permit for the proposed Fox Shaft discharge and on January 18, 1973, Consol was advised by the department that its application for a permit would be considered only as a request for amendment to its permit no. 3071301 covering the Renner Shaft discharge.

17. On March 27, 1972, Consol requested the issuance of a separate permit for its proposed Fox Shaft discharge at its Blacksville No. 1 Mine and on April 10, 1972, was advised by the department that:

"[I]t is presently the policy of this Department to issue only one permit for each individual mine regardless of the number of discharges or openings . . ."

18. On April 19, 1972, the department amended the Renner Shaft discharge permit no. 3071301 to include the proposed Fox Shaft discharge. The amended permit approved Consol's request to construct the Fox Shaft and to discharge water to Sharps Run.

19. On June 14, 1972, Consol received a letter from the department dated June 12, 1972, advising that the department would not issue a separate permit for the Fox Shaft discharge at Consol's Blacksville No. 1 Mine.

20. In addition to the Fox Shaft, Consol is currently constructing the new Rudolph Shaft into its Blacksville No. 1 Mine.

21. On or about October 23, 1974, Consol applied to the department for a mine drainage permit for the Rudolph Shaft discharge to be located in Perry Township. In making its application, Consol did not request a modification, revocation and/or amendment of any existing mine drainage permit.

22. By letter dated January 8, 1975, the department issued Consol a letter-permit including the Rudolph Shaft as an amendment to its existing mine drainage permit no. 3071301 for the Renner Shaft Mine drainage permit.

23. In January of 1975, Consol conditionally accepted the department's grant of a mine drainage permit for the Rudolph Shaft but reserved the right to appeal the department's action of making the permit an amendment to existing mine drainage permit no. 3071301.

24. The Humphrey No. 7 Mine of Christopher is located in Greene County and prior to July 26, 1967, the Mount Morris discharge at that mine was authorized by mine drainage permit no. 466M080.

25. On or about August 5, 1974, Christopher requested the issuance of a mine drainage permit to cover discharges from the proposed Shannon Run Air Shaft located in Perry Township. In making this application, Christopher did not request a modification, revocation and/or amendment of any existing mine drainage permit.

26. By letter dated January 20, 1975, the department issued Christopher a letter-permit including the Shannon Run Air Shaft as amendment to its existing mine drainage permit no. 466M080 covering the Mount Morris discharge.

27. In January, 1975, Christopher conditionally accepted the department's grant of a mine drainage permit for the Shannon Run Air Shaft but specifically reserved the right to appeal the department's action of making the permit an amendment to existing mine drainage permit no. 466M080.

28. Prior to the date of the first three appeals herein, the practice and/or procedure of the department to cancel all existing mine drainage per-

mits and issue only one consolidated permit was neither set forth in what is described by department personnel as the "P and P" Manual nor in any other publication of the department. At the time of the filing of the last two appeals, this practice and procedure was set forth in the Practice and Procedure Manual.

29. The practice and/or procedure of the department to cancel existing mine drainage permits and issue one consolidated permit for each mine or facility was developed prior to the creation of the Department of Environmental Resources.

30. The practice and/or procedure of the department to cancel all existing mine drainage permits and issue only one consolidated permit was formulated and applied to administer the permit program under The Clean Streams Law and is intended to be applied generally throughout the Commonwealth.

31. There are no written guidelines for exceptions from the practice and/or procedure of the department to cancel all existing mine drainage permits and issue only one consolidated permit.

32. The practice and/or procedure of the department to cancel all existing mine drainage permits and issue only one consolidated permit has not been applied retroactively to all existing mine drainage permits. This practice and/or procedure of the department is implemented only when an applicant applies for a permit for a new borehole, shaft or the like at an existing facility and is done in this manner because of the department's belief that manpower limitations would make it impossible for the department to undertake an immediate consolidation of all permits.

33. The practice and/or procedure of the department to cancel all existing mine drainage permits

and issue only one consolidated permit has not been promulgated as a rule or regulation of the department.

34. The "P and P" Manual of the Bureau of Water Quality Management sets forth some, but not all, of the general policies of the bureau and is not a document of public circulation. The general policies of the bureau are not fully set forth in any single publication.

35. The rules and regulations of the department set forth in 25 Pa. Code set forth various legal requirements imposed with respect to drainage from coal mines in Pennsylvania and are the only rules and/or regulations, duly promulgated in accordance with applicable Pennsylvania law, that apply to drainage from coal mines.

36. From the depositions of those responsible for instituting the practice and/or procedure of consolidation, it appears that the reason for the change in policy was primarily administrative—so that all the information concerning one mine would appear at one place in the department's files. However, it was also recognized and intended by those instituting the policy that one permit would be a more effective enforcement tool than several permits by enabling the department to review a permit upon application for amendment and, possibly, by enabling it to revoke a permit for an entire operation where there was a discharge violation.

## DISCUSSION

The first question appellants raised is whether the department has the authority under section 315 of The Clean Streams Law of June 22, 1937, P.L. 1987, as amended, 35 P.S. §691.315, to issue one consolidated mine drainage permit for an entire

mine operation, including discharges applied for later in time, or whether it is required to issue separate permits for each discharge at a given mine. Section 315(a) provides, in pertinent part:

"§691.315 Operation of mines.

"(a) No person or municipality shall operate a mine or allow a discharge from a mine into the waters of the Commonwealth unless such operation or discharge is authorized by the rules and regulations of the board or such person or municipality has first obtained a permit from the department. Operation of the mine shall include preparatory work in connection with the opening or reopening of a mine, backfilling, sealing, and other closing procedures, and any other work done on land or water in connection with the mine. A discharge from a mine shall include a discharge which occurs after mining operations have ceased, provided that the mining operations were conducted subsequent to January 1, 1966, under circumstances requiring a permit from the Sanitary Water Board under the provisions of section 315(b) of this act as it existed under the amendatory act of August 23, 1965 (P.L. 372) [1. This section]. The operation of any mine or the allowing of any discharge without a permit or contrary to the terms or conditions of a permit or contrary to the rules and regulations of the board, is hereby declared to be a nuisance . . ."

Appellants construe this provision, emphasizing the disjunctive "operation *or* discharge," to mean that the department must issue a permit either for an "operation," which may or may not have one discharge, or for any separate discharge that is not covered by the operation permit. Appellants argue that the statute would have to read "operation *and*

discharge" in order to support the department's policy, and that the disjunctive "or" must be given effect according to the rules of statutory construction. See Pennsylvania Statutory Construction Act of November 25, 1970, P.L. 707 (No. 230), as amended, 1 Pa.C.S. §1922(2); and Garratt v. Philadelphia, 387 Pa. 442, 445, 127 A. 2d 738 (1956). The Commonwealth argues, on the other hand, that the statute gives it the discretion to issue permits either for an operation or for separate discharges, and claims that, if anything, the statute mandates that permits be issued for entire operations rather than for separate discharges.

We have not been able to uncover any legislative guidance on this point, but we believe appellant's construction is overly literal and not in accordance with the past practice of the department any more than the present practice.[1] The disjunctive "or" does not mean to us that operations and discharges must be licensed by separate pieces of paper, but that either must be licensed, with or without the other. See, e.g., Commonwealth v. United States Steel Corp. et al, Pa. Commonwealth Ct. docket no. 252, C.D. 1973, where the court prohibited preparatory work relating to a deep mine, but not involving any discharge, until the company obtained a mine drainage permit. It seems likely, as the Commonwealth contends, that the disjunctive "or discharge" was primarily intended to cover discharges from nonoperating mines, which constitute a major portion of the pollution hazard from mining in Pennsylvania. The third sentence of section 315, which defines discharges to include

---

1. Previously, the separate discharge permits apparently included operations in the case of an operating mine with a discharge or discharges.

nonoperating discharges, makes this clear. Appellants point out that that sentence says discharges "shall include" nonoperating discharges, and, therefore, the phrase "or discharge" must refer to the larger category of discharges in general. While we agree with appellants as to the literal meaning of the words, we do not think it follows that section 315 requires the issuance of a separate permit for each discharge at a mine.

It is clear that the object of section 315 dealing with the "operation of mines" is to prevent discharges to the waters of the Commonwealth. Whether this is accomplished by one permit for a particular mine that includes operations and discharges, or whether it is accomplished by separate permits for the operation and the discharges would not seem to make much difference, and, in our view, section 315 does not specify. At the outset, therefore, the department would have some discretion to fashion a permit system that accomplishes the goal of assuring that both the operation and discharges, or either occurring separately, at a mine are permitted. In the abstract, there would appear to be merit to either a one-permit system or a separate permit system. There is certainly some practical justification for the department's present policy of treating one mine as a hydrologic entity. On the other hand, it would apparently be consistent with the other permit systems under The Clean Streams Law, such as for industrial wastes, and with the Federal NPDES permit system established under the Federal Water Pollution Control Act, 33 U.S.C. §1151, June 30, 1948, 62 Stat. 1155, as amended, et seq., to issue separate permits for each point of discharge. Whatever system the department adopted, however, should have some ra-

tional basis in administrative practice, should be accessible to the parties affected and should be consistently and fairly applied.

This brings us to appellants' second contention that the revocations, consolidations and amendments here are invalid because of procedural irregularity. Appellants contend that a change in substantive policy such as the one made by the department must be accomplished by regulation and cannot be done simply by informal fiat on a case by case basis. The Commonwealth argues, essentially, that if there is statutory authority for the instituted administrative practice, the change does not require any publication or other process other than the notice of the new system given to operators upon their applications for discharge permits. We do not agree.

In the best of all possible administrative worlds, all *general* pronouncements of policy and certainly all changes in general policy would be duly proclaimed by regulation after an appropriate deliberative rule-making process. See Davis, Administrative Law Treatise, Vol. I, §5.01. However, in our view, the law does not require a rule-making or other formal procedure unless the pronouncement of policy or change in policy will affect substantive rights. The question thus becomes whether this administrative change affects the appellants' position in any way.

The department claims that its policy of consolidation was instituted simply for administrative reasons. Mr. Giovanetti, who originated the one-permit policy, said it came about after the department personnel, reviewing a mine drainage application, failed to consider every discharge at a certain mine because the mine had discharge points in

two different townships and, as the department's files are organized by townships, the information was in different file drawers.[2] Appellants believe that their substantive rights are potentially affected because the department will use the consolidated permit as an enforcement tool to close down an entire operation when one discharge, even an unrelated discharge, is in violation. The department acknowledges that consolidation "enhances" enforcement by giving the department the power to review a permit on any new amendment or, conceivably, by revoking a permit when any discharge is in violation, although the department's witnesses did not recall any such revocation in the five years during which the policy has been in effect.

We have given very careful consideration to appellants' contention under the enforcement sections of The Clean Streams Law, because whether or not the new policy improves the department's filing system, the department cannot make informal administrative changes based on such considerations if the changes affect substantive rights.[3] Under the enforcement provisions, the department

2. Appellants have pointed out that the new system doesn't make much more sense administratively, since a consolidated permit will appear in one township file when a mine may have a discharge to a different stream in a different township. Apparently, the department has not cross indexed its files to make the consolidated permit accessible for each affected township.

3. We do not accept the department's argument that we cannot consider the possible effect this consolidation might have on enforcement until an enforcement question actually arises. This is certainly true as to any specific enforcement question; however, these consolidations have occurred, and it is appropriate for us to inquire into their general purpose and consequence in deciding whether or not they are invalid.

has a variety of remedies for any violations of the act. Under section 609, it may refuse to issue a new permit to an operator who has an existing violation at any operation if it concludes that this violation indicates an intent not to comply with the laws. Under section 610, the department may issue such enforcement orders, including revocations or suspension, "as are necessary to aid in the enforcement of the provisions of [The Clean Streams Law]." Among its remedies, the department may issue an order "requiring persons or municipalities to cease operations of an establishment which, in the course of its operation, has a discharge which is in violation of any provision of this act." This power is constrained by the following sentence with its material proviso:

". . . Such an order may be issued if the department finds that a condition existing in or on the operation involved is causing or is creating a danger of pollution of the waters of the Commonwealth, or if it finds that the permittee, or any person or municipality is in violation of any relevant provision of this act, or of any relevant rule, regulation or order of the board or relevant order of the department: Provided, however, That an order affecting an operation not directly related to the condition or violation in question, may be issued only if the department finds that the other enforcement procedures, penalties and remedies available under this act would probably not be adequate to effect prompt or effective correction of the condition or violation . . .": 35 P.S. §691.610.

Under these provisions, it appears to us that whether the department issues one permit for an operation or several permits for discharges at that operation, it has the same power to close down the

operation either by revocation of an operation permit in the case of one permit, or by a cease operations order in the case of separate discharge permits when there is a danger to the waters of the Commonwealth. However, there may be some strategic advantage to revocation, since its effect is, at least technically, immediate. See 25 Pa. Code §99.24. The primary instance where one permit might initially enlarge the enforcement power of the department is in the case of an unrelated discharge at one mining operation. To the extent it is possible to have an unrelated discharge at one mining operation, the revocation of one permit by the department could circumvent that requirement of the proviso that an order to cease operations on account of any unrelated discharge only be issued where other enforcement remedies could be inadequate to effect prompt correction of the condition in violation. Although we do not expect the department to abuse its power and we are aware that, on review, the department will be held to a remedy that is appropriate to the offense and necessary to the enforcement of the act (Mill Service, Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources, Pa. Commonwealth Ct. docket no. 164, C.D. 1975, issued November 17, 1975), it does appear to us that the one permit system could make some substantive difference to operators, and that it should, therefore, have been accomplished by a rule-making procedure.

In sum, we believe that a one-permit system for mine operations may be a permissible and even logical procedure under The Clean Streams Law, but that it was a significant interpretative change of general and possibly substantive effect and should, therefore, have been accomplished by regu-

lation.[4] The articulation and publication of the rules under which the department is operating is necessary as a guarantee of due process and protection against the arbitrary exercise or abuse of administrative power.[5] This board has held in another context that the department cannot act on the basis of unpublished policies. See Doraville Enterprises v. Commonwealth of Pennsylvania, Department of Environmental Resources, Environmental Hearing Board docket no. 73-433-C, issued October 21, 1975. If the department wishes to implement interpretative policy, it must cause a regulation to be adopted by the Environmental Quality Board in a manner consistent with the Commonwealth Documents Law of July 31, 1968, P.L. 769 (No. 240), as amended, 45 P.S. §§1101, et seq.[6] Although

4. Note that there is a presumption in favor of the correctness of contemporaneous administrative interpretations of a statute, which would here favor separate permits. See Loeb Estate, 400 Pa. 368, 373, 162 A. 2d 207 (1960); Davis, supra, §5.06. Certainly, such a presumption would need to be overturned by a more formal procedure that was used in these cases. See Schley v. Conservation Commission of Missouri, 329 S.W. 2d 736 (Sup. Ct. of Missouri, 1959).

5. See Taylor v. Weinstein, 207 Pa. Superior Ct. 251, 254, 217 A. 2d 817 (1966); West Penn Power v. P. U. C., 174 Pa. Superior Ct. 123, 100 A. 2d 110 (1953), and see Publishing Practice-Administrative Agencies, 36 Temple L.Q. 551 (1963), as to the need for publication of agency rules. See also The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform, 118 U. of Pa. L. Rev. 485 (1970).

6. Conceivably, an administrative policy such as this one could be promulgated by a less formal process than regulation. However, the department's policies and procedures are apparently largely for internal purposes, and since they are not published or circulated, do not serve to inform those regulated of the rules the department is applying or proposed changes in those rules.

the new permit system was not published as a regulation, it certainly meets the definition of a regulation in the Administrative Agency Law of June 4, 1945, P.L. 1388, as amended, 71 P.S. §1710.2(e), viz.:

" 'Regulation' means any rule, regulation or order in the nature of a rule or regulation, of general application and future effect, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency, or prescribing the practice or procedure before such agency."

The present regulations on mine drainage permits, 25 Pa. Code §§99.01, et seq., do not make clear whether permit applications are to be for operations including discharges or for separate discharges. Furthermore, they do not set forth any procedure for amendment of permits to include new discharges. While the amendment process may be an acceptable way of permitting new discharge points at a mine, the procedure for amending permits must be clearly set forth and constrained. We do not agree, for instance, with the department's witness who thought that the opportunity to review a permit on a proposed amendment would enable the department to alter the conditions of a permit. It is fundamentally offensive to our sense of justice in a democratic society for the State to be able to alter the conditions of a previously granted permit because an applicant is seeking some new permission. If an operator has violated the terms of his permit, the permit may be revoked or suspended for cause in accordance with enforcement provisions; but it is not proper when there is no evidence of violation for the department to use the occasion of his applying for a new permit to change the condi-

tions of his old permit. The case of the Oakfoot Mine here is particularly offensive. There, the operator asked to eliminate a discharge and the department took that opportunity to consolidate two other discharge permits so as potentially to have more power over the operator.

We should comment finally upon the question of whether, if and when the department publishes its one-permit system in the form of regulations, these regulations may apply retroactively to consolidate all existing mine drainage permits. The sound view of this issue is that while clarification of unsettled law may sometimes be made retroactively, changes in settled law should be made prospectively. See Davis, supra, §5.06, and cases cited therein. In these cases, we would distinguish between existing permits that were consolidated, as in the case of the Oakfoot Mine, and cases where new discharge points were sought after the department began applying its one-permit system. In the latter cases, the operators did, in fact, have notice of the new system, although the method of adopting the new policy was procedurally inadequate in our view. However, if after due deliberation the department formally adopts the one-permit system through articulated rules, we believe that the rules could apply retroactively to those operators who had notice of that new policy when they applied for a new discharge permit.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and the subject matter of this dispute.

2. Section 315 of The Clean Streams Law does not require the department to issue separate permits for each discharge at a mine. It requires that the operation of a mine as well as discharges at the

mine be permitted, or that either occurring separately is permitted.

3. The change from a separate discharge permit system to a one-permit system is a sufficiently general change in policy of possibly substantive effect to require that this change be effected by prospective, articulating regulation, rather than by informal, individual notice.

4. In view of the procedural deficiencies of the department's change in administrative policy, the revocations, amendments and consolidations of mine drainage permits attempted in these cases were invalid.

### ORDER

And now, January 30, 1976, the appeals in these cases are sustained and the revocations, amendments and consolidations of appellant's mine drainage permits are declared invalid.